UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MOLINA HEALTHCARE OF INDIANA, INC., KATHRYN R. BROWN, JOSEPH MILES, MICHAEL COLBY, JOHN B. O'DONNELL, M.D., ALICE EVANS, HEATHER AYERS-MARSH AND CARESOURCE INDIANA, INC., | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:06-cv-1483-JDT-WTL |
| CARRIE HENDERSON in her official capacity as the Commissioner of the Indiana Department of Administration, E. MITCHELL ROOB, JR., in his official capacity as the Secretary of the Indiana Family and Social Services Administration, and JEANNE LABRECQUE, in her official capacity as the Director of the Office of Medicaid Policy and Planning, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| COORDINATED CARE CORPORATION INDIANA d/b/a MANAGED HEALTH SERVICES, ANTHEM INSURANCE COMPANIES, INC., and IU HEALTH PLAN, INC. d/b/a MDWISE, INC., | ) ) ) ) ) ) ) ) | |
| Intervenor Defendants. | ) | |

**ENTRY ON DEFENDANTS' AND INTERVENOR DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' COMPLAINTS AS AMENDED (Doc. Nos. 31-8, 47-2, 56, 58, 61 (1:06-cv-1483), Doc. Nos. 26-10, 43-2 (1:06-cv-1486))**

This lawsuit arises from the effort of two health care companies to stop the

State of Indiana from making a change in the companies who administer the

delivery of health care under the Indiana Medicaid Program to approximately 535,000 Hoosier low income families, children, and pregnant women. Medicaid is a joint federal/state program, in which the federal government provides about sixty percent of the money and the state pays for the remainder and arranges for the delivery of services.

Participation is voluntary. However, when a state elects to participate, compliance with federal statutory and regulatory requirements is mandatory. With the federal government's permission, the state has provided health care through a managed care program known as Hoosier Healthwise. The state contracts with health care companies, which in turn contract with physicians, medical facilities, and other providers. Medicaid recipients can then subscribe to one of these networks and thereby obtain health care, presumably at lower cost but with the improved health benefits resulting from a coordinated program.

Plaintiffs Molina Healthcare of Indiana, Inc. ("Molina") and CareSource Indiana, Inc. ("CareSource") are two of the health care companies, also known as managed care operators, who are currently under contract with Indiana. However, their continued participation in Hoosier Healthwise is in doubt.

In May 2006, rather than renew its existing managed care contracts, state officials decided to reorganize the way healthcare was delivered. They issued a Request for Services, seeking companies to provide managed care. Seven companies, including Molina and CareSource responded, vying for a share of the contracts, estimated at $4.4 billion over the life of the four-year contract.

Only three companies were selected.  These are the Intervenor Defendants: Coordinated Care Corporation Indiana, doing business as Managed Health Services ("MHS"), Anthem Insurance Companies ("Anthem"), and IU Health Plan, Inc., doing business as MDwise, Inc. ("MDwise").

Litigation began first in Marion County Superior Court when one of the losing bidders,[1] Harmony Health Plan of Indiana, Inc., filed suit seeking judicial review of the decision of the State of Indiana (the "State").  That suit was dismissed for lack of jurisdiction and other grounds, although not before Molina and Coordinated Care had an opportunity to participate, and Molina filed its own lawsuit in state court.  Harmony has since appealed to the Indiana Court of Appeals, and Molina dropped its state court proceeding.

On October 10, 2006, Molina and CareSource filed separate complaints in this court seeking injunctive and declaratory relief for alleged violations of federally secured rights, stemming from what they contend was a "fundamentally flawed" procurement process.  Joining Molina, either in its initial complaint or as subsequently amended, were Molina employees Kathryn R. Brown, Joseph Miles, and Michael Colby, provider network physician John B. O'Donnell, M.D., and Medicaid subscribers to Molina's network, Alice Evans and Heather Ayers-Marsh (collectively with Molina, the "Molina Plaintiffs" and collectively with

---

[1] For the ease of the reader, the court will refer to the companies which submitted proposals as "bidders," even though the State did not issue a request for bids but a request for services, which are governed by different rules.

CareSource, the "Plaintiffs").  The lawsuits were filed against three state officials in name but the State in fact.

The court consolidated the lawsuits on November 1, 2006, and held a hearing on November 21, 2006, on the Plaintiffs' motions for a preliminary injunction.  At this hearing, the court also heard oral arguments on the motions to dismiss made by the State and the Intervenor Defendants (collectively the "Defendants").

The respective motions for preliminary injunction or dismissal under 12(b)(1) or 12(b)(6) of the Federal Rules of Civil Procedure have been fully briefed.  The motions are therefore ripe for review.  The court rules as follows.

## I.  BACKGROUND

### A.  The Parties

All the parties are citizens of Indiana.  CareSource is an Indiana not-for-profit corporation with its principal place of business in Indianapolis, Indiana.  Molina is an Indiana corporation with its principal place of business in Merrillville, Indiana.

As noted above, Brown, Miles, and Colby are employees of Molina, while Dr. O'Donnell is a Medicaid provider currently under contract with Molina and Evans and Ayers-Marsh are two of his patients under the Molina network.[2]

---

[2]  Molina's lawsuit initially included three different plaintiffs: Charles Coats, M.D. and Leonora Noel, M.D., both of whom had contracted with Molina to be part of its Hoosier Healthwise provider network, and Alisha Brown, who, along with five of her grandchildren, was a patient of Dr. Coats under the Molina network.  After the filing of (continued . . .)

Other parties include the Intervenor Defendants, Anthem, MHS, MDwise – and the named defendants: Carrie Henderson, Commissioner of the Indiana Department of Administration ("IDOA"), which provides administrative services to other State agencies, E. Mitchell Roob, Jr., Secretary of the Indiana Family and Social Services Administration ("FSSA"), and Jeanne LaBrecque, Director of the Office of Medicaid Policy and Planning ("OMPP"), which is the FSSA unit charged with administering the Medicaid program in Indiana.

### B.  The Controversy

In an effort to promote the goals of cost effectiveness and efficiency (without sacrificing the delivery of health care services), Congress authorized a "waiver" program to allow states to deliver Medicaid health care through managed care programs.  A Section 1915(b) waiver, as these waivers are called, allows a state to contract with managed care operators ("MCOs") for the provision of health care benefits to Medicaid recipients.  Managed care programs differ from the default fee-for-service plans, in which the State pays the individual providers directly.  In contrast, under a managed care program, the State contracts with MCOs who pay providers through various contracting arrangements.  In return for rates that are sometimes higher than those provided in a fee-for-service program, the providers help manage the patient care and

---

this action, MDwise offered Dr. Coats a contract to participate in its 2007 provider network under the Hoosier Healthwise program.  MDwise offered to compensate Dr. Coats at 130% of the applicable Hoosier Alliance Fee Schedule and $3.00 per covered patient per month.  MDwise had contracted with other providers in the Northeast region of Indiana at rates of 115 – 130% with a $3.00 or $3.50 patient fee.  Molina subsequently obtained the court's permission to substitute Dr. O'Donnell, Evans, and Ayers-Marsh as plaintiffs for Dr. Coats, Dr. Noel, and Brown in its Second Amended Complaint.

eliminate medically unnecessary treatment, which results in lower utilization and thus cost savings.  The State asserts that it receives substantial savings in administrative expense and overall cost.  Moreover, a managed care program assures the state of more accurate and reliable budget projections because MCOs are paid according to contract rates based on the number of patients they have enlisted in their networks.

In this litigation, although the Plaintiffs have raised a variety of legal claims and defenses, the heart of their claims is an allegation that the State violated their federal rights by manipulating the selection of its new MCOs, or at least failing to follow the applicable state and federal procurement rules.

The Defendants have likewise responded with a variety of defenses, including claims that the doctrines of res judicata, comity, or abstention bar or should bar the Plaintiffs from proceeding.  At the most basic level, the Defendants have asserted that Plaintiffs lack standing to be in court because they cannot show a redressable injury resulting from the State's conduct. Alternatively, the Defendants maintain that the court should dismiss the consolidated lawsuit because the Plaintiffs do not have a federal cause of action for their grievances.

Through uncontested averments in the complaints, stipulation, and the introduction of testimony and documents at a hearing on the preliminary injunction motions, many, many additional facts about the state procurement process and the state court litigation were introduced.  While the court has received all of the foregoing facts, they are not discussed or considered in

6

conjunction with this ruling.  In short, the particular criticisms of the evaluation process leveled by the Plaintiffs are not reached in this disposition of the claims.

## II.  STANDARD OF REVIEW

The Defendants seek to dismiss this case under Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and Rule 12(b)(6), for failure to state a claim upon which relief may be granted.  Under either motion, the court accepts as true all well-pleaded factual allegations in the complaint and draws any reasonable inferences in favor of the Plaintiffs.  *See Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002)*; Ezekiel v. Miche*l, 66 F.3d 894, 897 (7th Cir. 1995); *Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 730 (7th Cir. 1994).  This standard means that if any set of facts, even hypothesized facts, could be proven consistent with the complaint, justifying relief in favor of the Plaintiffs, then the complaint must not be dismissed.  *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994).

Jurisdiction is the power to hear a case and ordinarily must be determined early, and at every stage of litigation.  *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003).  In ruling on a 12(b)(1) motion, the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."  *Ezekiel*, 66 F.3d at 897 (quoting *Capitol Leasing Co. v. Fed. Dep. Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993) (citation omitted)).

In ruling on a 12(b)(6) motion, the court is generally restricted to the pleadings, any attached exhibits, and supporting briefs.  *See Thompson*, 300 F.3d at 753.

## III.  DISCUSSION

The Plaintiffs seek to enjoin the State's award of managed care contracts for its Hoosier Healthwise program under a variety of legal theories.  Foremost, they bring claims, under 42 U.S.C. § 1983, alleging that the State's selection process violated rights secured to them by the Medicaid regulations. (CareSource Am. Compl. Counts III-IV; Molina Sec. Am. Compl. Counts I-IV.) CareSource also brings § 1983 claims alleging that the State violated its constitutional rights to procedural due process (CareSource Am. Compl. Count I) and to substantive due process (*id.* Count II).[3]  CareSource further asserts the State violated federal procurement laws, regulations, and norms (*id.* Counts V-VI), and breached its duty to treat all bidders honestly and fairly (*id.* Count VII); although it does not identify precisely whether it brings these latter claims pursuant to § 1983 or an implied right of action, or as supplemental claims under

---

[3]  Although CareSource has labeled Counts I and II as claims based on procedural and substantive due process violations, presumably brought under the Fourteenth Amendment, the text of these counts refers neither to the Fifth nor Fourteenth Amendments but instead complains, as in Counts III and IV, of violations of rights secured by the Medicaid statutes and implementing regulations.  Inasmuch as CareSource has argued in its briefs and oral arguments of constitutional deprivations, the court will consider these separately from the Plaintiff's "laws" claims under § 1983.

state law.[4]  Both groups of plaintiffs seek declaratory judgments in addition to injunctive relief.  (*See id.* Count VIII; Molina Sec. Am. Compl. Count V.)

The Plaintiffs' right to come before this court rests on their § 1983 claims. Although they have requested declaratory relief under the Federal Declaratory Judgment Act, this statute does not provide the court with jurisdiction.  *TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 634 (7th Cir. 2003).  Rather, jurisdiction under the Act depends on the underlying substantive claims. Theoretically, this court could have jurisdiction under an implied rights analysis of federal procurement laws, but Plaintiffs have not argued for such an implied right and, as will be discussed later, the court finds no basis for determining such a right.

Section 1983, which has its origins in the Ku Klux Klan Act of 1871, provides the mechanism for enforcing rights, privileges, and immunities secured by the Constitution and the laws of the United States.[5]  The provision was little used until the Supreme Court declared in *Monroe v. Pape*, 365 U.S. 167, 183 (1961), that a plaintiff did not have to show that state law failed to provide a

---

[4]  In its response brief, CareSource appears to treat Counts V-VI as § 1983 claims.  (*See* CareSource Resp. Br. 24.)

[5]  The statute reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United State or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

 42 U.S.C. § 1983.

remedy for a violation of a constitutional right.[6]  Nearly two more decades passed before the Court also declared that a plaintiff could bring a § 1983 cause of action arising from the violation of non-constitutional rights secured by federal law.  *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980).  Not every violation of a federal statute involves a deprivation of a federal right.  Since *Thiboutot*, the Court has made clear that only statutes that "unambiguously confer" private rights are the proper focus of a  § 1983 "laws" cause of action.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).

Before discussing how the development of § 1983 law affects the Plaintiffs' claims, however, the court must address a preliminary matter.  The Defendants assert that the Plaintiffs lack standing and, therefore, that the court lacks jurisdiction to hear this matter.  (*See, e.g.*, State Br. Supp. Mot. Dismiss 9-22.)  If so, the court must dismiss the Plaintiffs' claims for lack of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

### A.  Standing

Standing involves both constitutional and prudential concerns.  *See, e.g., O'Sullivan v. City of Chicago*, 396 F.3d 843, 853-54 (7th Cir. 2005); *Indemnified Capital Invs. v. R.J. O'Brien & Assocs.*, 12 F.3d 1406, 1408 (7th Cir. 1993).  The

---

[6]  Nor must a plaintiff in most instances exhaust state remedies before bringing a cause of action under § 1983, unless Congress has indicated its intent to require such exhaustion.  *See Monroe*, 365 U.S. 167 at 183; *see also Blessing v. Freestone*, 520 U.S. 329, 347 (1997) (stressing that a plaintiff's ability to invoke § 1983 cannot be defeated by "the availability of administrative mechanisms to protect the plaintiff's interests") (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989)); *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982) (holding that "exhaustion of state remedies should not be required as a prerequisite to bring an action pursuant to § 1983").

constitutional component arises from Article III's limitation of federal jurisdiction to actual cases or controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Supreme Court has identified three elements necessary to meet the case-or-controversy requirement. *Id.* First, the plaintiff must suffer an "injury in fact," which the Court has defined as an invasion of a legally protected interest that is concrete and particularized, and actual or imminent. *Id.* Second, the injury must be "fairly traceable" to the challenged conduct or act. *Id.* Third, the court must find some likelihood that a favorable decision will remedy the injury. *Id.* at 561.

Defendants devote considerable attention to addressing each of these elements. The State asserts, for example, that none of the Plaintiffs' injuries— the loss of business, the loss of a job or contract, or the termination of a physician-patient relationship—is a legally protected interest. (State Br. Supp. Mot. Dismiss 10.) It claims the Plaintiffs cannot show the required causal connection because the Molina and CareSource contracts were set to expire and neither company claims they would have been the successful bidders in the absence of the claimed errors and improprieties. (*Id.* at 19.) Finally, it states that an injunction will fail to redress their claimed injuries because an injunction will not ensure CareSource's and Molina's continued participation in Hoosier Healthwise. (*Id.* at 21-22.)

These arguments would capture the day if the standard for constitutional standing was as formidable as Defendants imply. It is not. The Seventh Circuit has described the requirements of injury in fact, traceability, and redressability as

"rather 'undemanding.'"  *Family & Children's Ctr., Inc. v. Sch. City of Mishawaka*, 13 F.3d 1052, 1058 (7th Cir. 1994) (quoting *N. Shore Gas Co. v. EPA*, 930 F.2d 1239, 1242 (7th Cir. 1991)).  A plaintiff must have a stake in the outcome that goes beyond intellectual curiosity or dislike, but injury in fact requires little more than that.  *Id.*  Likewise, a plaintiff need only show a "probabilistic benefit from winning a suit."  *N. Shore Gas*, 930 F.2d at 1242.

In this case, the Plaintiffs have alleged that the State's decision regarding the 2007 contracts will cost the companies their business, the employees their jobs, the doctors their contracts, and patients their present physicians.  These are injuries.  Moreover, they are injuries that the Plaintiffs allege might not have occurred but for the violations of rights afforded by the Medicaid Act, the federal procurement rules, and the requirements of due process.[7]  This satisfies the requirement of traceability to the invasion of legally protected interests.  Finally, there is at least a possibility, if the facts alleged by the Plaintiffs are true and an injunction results, that Molina and CareSource would be successful bidders, or at least have their contracts renewed.  This is all that constitutional standing requires.

Whether the Plaintiffs actually have legally protected interests or whether they can establish causation are not matters of jurisdiction, to be decided by a

---

[7]  The State argues that, under Indiana law, Plaintiffs have no right or interest in a contract with the State.  (State Br. Supp. Mot. Dismiss 14).  However, the basis of Plaintiff's claims, and for federal jurisdiction, arises from rights allegedly provided by federal law, not state law.  "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."  *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973).

Rule 12(b)(1) motion, but issues on the merits, whether judged on the pleadings under Rule 12(b)(6), the submitted evidence under Rule 56, or at trial.  In *Bruggeman ex. rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 908-09 (7th Cir. 2003), several developmentally disabled adults alleged that the state of Illinois' failure to provide additional residential facilities violated a Medicaid statute requiring the prompt provision of medical assistance.  The district judge ruled that the plaintiffs lacked standing because none of the Medicaid provisions granted them any entitlement to the services they were seeking.  *Id.* at 909.  The Seventh Circuit reversed, describing the district judge's decision as a "misunderstanding of standing."  *Id.*  When a court determines that a claim has no merit, it is also determining that the plaintiff cannot have been injured by any wrongful conduct. *Id.*  However, this "is a ruling on the merits, having nothing to do with jurisdiction." *Id.*

The Plaintiffs' pleadings, therefore, satisfy Article III's case-or-controversy requirement.  This does not end the standing inquiry, though, because the Plaintiffs must satisfy the prudential or judicially imposed limits on federal jurisdiction.  *O'Sullivan*, 396 F.3d at 854.  Here the considerations include the general prohibition on litigants raising another person's rights and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law involved.[8]  *Id.*; *see also Allen v. Wright*, 468 U.S. 737, 751 (1984).  In

---

[8]  The zone of interests requirement developed in the context of federal administrative law, as a "gloss on the meaning of [5 U.S.C.] § 702."  *Clarke v. Sec., Indus. Ass'n*, 479 U.S. 388, 395-96 (1987).  Section 702 limits judicial review of agency actions to persons suffering a legal wrong or adversely affected or aggrieved.  The Court (continued . . .)

litigation challenging a state action, these considerations are especially important because "federal courts have the added responsibility to ensure that their actions do not strain unnecessarily the principles of federalism." *O'Sullivan*, 396 F.3d at 854. These prudential concerns also ensure that federal litigation is confined to those "litigants best suited to assert a particular claim." *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 294 (7th Cir. 2000) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99-100 (1979)).

Here the matter before the court involves both prudential concerns. CareSource is bringing its claims not just for itself but on behalf of Medicaid recipients who obtain health services through CareSource's providers. (CareSource First Am. Compl. ¶ 3.) Likewise, although two Medicaid recipients have joined Molina in its complaint, Molina and its employees assert standing to bring their claims on behalf of Medicaid recipients who obtain services from Molina providers. (Molina Sec. Am. Compl. ¶ 9.) Both groups of Plaintiffs are also alleging that certain Medicaid statutes afford them specific rights – rights that the Defendants contend are outside the scope or purpose of these statutes. (*See, e.g.*, Anthem Reply 5-9.)

If Plaintiffs are correct, standing is appropriate. Congress can create jurisdiction within the boundaries of Article III. *Kyles*, 222 F.3d at 294. It may

---

added the zone of interest test because it believed that Congress had not intended to allow suit by every person suffering injury in fact. *Id.* As such, the zone of interest test is sometimes limited to claims under the Administrative Procedures Act. However, as the Court noted in *Clarke*, "We have occasionally listed the 'zone of interest' inquiry among general prudential considerations bearing on standing, and have on one occasion conducted a 'zone of interest' inquiry in a case brought under the Commerce Clause." *Id.* at 400 n.16 (citations omitted).

authorize parties to bring suit based on the violations of others.  *Id.*  It may allow litigation by parties who would not seem to be the natural beneficiaries of a statute.  *Id.*  "When Congress confers such a broad right to sue, the judiciary may not close the doors to the courthouse by invoking prudential considerations."  *Id.* (citing *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).

In this case, the Plaintiffs' ability to demonstrate prudential standing depends on the rights conferred by the Medicaid statutes.  This creates a procedural issue because questions about statutory and prudential standing overlap the requirement in a § 1983 "laws" cause of action to show that the statute unambiguously provides the plaintiff with a right.  The scope of the statute may even decide CareSource's due process claims as well, because CareSource has asserted, expressly with regard to procedural due process and at least implicitly with regard to substantive due process, that its protected interests derive from these Medicaid regulations.  (*See* CareSource First Am. Compl. ¶¶ 64-65, 69.)

The overlap is not always great.  A plaintiff need only fall within a broad "zone of interest" to demonstrate prudential standing while a § 1983 "laws" claim requires a strict determination that Congress has "unambiguously conferred" a right.  To the extent that Plaintiffs' injuries arise merely from the statutory violation, however, the inquiries appear parallel.  The court could determine, as a matter of jurisdiction, that the Medicaid statutes do not confer standing on the Plaintiffs and their injuries lie outside the scope of the Medicaid Act.  Or the court

could decide, as a matter of law that the Plaintiffs do not have a federal cause of action.  As *Bruggeman* points out, however, determining that a cause of action does not exist is different than merely requiring a plaintiff to plead the requirements of standing.  *But see Kyles*, 222 F.3d at 294 (deciding standing, in a non § 1983 case, by examining the rights conferred by the statutes).  In any event, non-Article III standing issues "may be bypassed in favor of deciding the merits when the outcome is unaffected and the merits issue [is] easier than the jurisdictional issue."  *McNamara v. City of Chicago*, 138 F.3d 1219, 1222 (7th Cir. 1998); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 96-97 (1998) (holding that although Article III standing must be decided first, a court may determine if a cause of action exists before deciding if a plaintiff comes within the statute's zone of interests).  The court will therefore examine whether Plaintiffs have a cause of action under § 1983 for their alleged injuries.[9]

---

[9]  Of the various types of plaintiffs in these two cases, the Molina employees' standing is on the thinnest ice.  It could easily be said that their interest in continued employment at Molina is well outside any zone of interest created by the Medicaid Act. *See, e.g., Am. Fed. of Gov't Employees, Local 2119 v. Cohen*, 171 F.3d 460, 471 (7th Cir. 1999) (holding that the interest in employment, "without something more," did not create standing for employees under a statute promoting the outsourcing of supplies and services.)  The interests of the employees are completely derivative of Molina's and are probably not cognizable under conventional standing analysis.  However, given the urgency surrounding the requested injunctive relief sought here and the negative outcome of the claims for the reasons discussed later, the court will not delay to delve deeply into this questionable theory of standing.

The court suspects that Molina included its employees principally to demonstrate dramatically that a loss (or shift) of employment may occur if the MCO contracts are allowed to be executed.  Molina's failure to cite legal authority for such derivative standing is noted and nothing more need be written about the employees' claim to standing.

### B.  Enforcement of Rights Secured by Federal Law

The availability of a § 1983 cause of action involves a two-part inquiry. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989). First, a plaintiff must assert the violation of a right.  *Id.*  As the Supreme Court has repeatedly emphasized, merely asserting the violation of a law is not sufficient; a plaintiff can only use § 1983 to address the violation of a right.  *Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002); *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 509 (1990).  The language of § 1983 clearly limits the cause of action to deprivations of "rights, privileges, or immunities."  42 U.S.C. § 1983.

Secondly, § 1983 is not available if Congress specifically foreclosed such a remedy.  *Golden State*, 493 U.S. at 106.  Here, Congress can provide a comprehensive remedial scheme sufficient "to demonstrate congressional intent to preclude the remedy of suits under § 1983."  *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).  The state argues that under the language of 45 C.F.R. § 92.36, the Department of Health and Human Services has established a state remedial scheme sufficiently comprehensive to supplant § 1983.  (State Br. Supp. Mot. Dismiss 51.)  This argument is misplaced.  It is not the existence of a remedial scheme that supplants § 1983. Rather, it is Congress' expression of intent, through the adoption of a comprehensive remedial scheme, that precludes § 1983.  An executive agency cannot establish congressional intent.

The Medicaid Act, a spending provision, contains no comprehensive remedial scheme.  *See Wilder*, 496 U.S. at 521.  It merely authorizes the withholding of approval of a state plan or the curtailing of federal funds.  *Id.*  Such remedies are not a comprehensive remedial scheme evincing a congressional intent to preclude resort to § 1983.  Only twice has the Supreme Court found a remedial scheme "sufficiently comprehensive" to supplant § 1983, and these involved schemes with "unusually elaborate enforcement provisions" or "carefully tailored" procedures.  *Blessing*, 520 U.S. at 347 (citing the "panoply of enforcement actions" provided by the Federal Water Pollution Control Act as the basis for its denial of a § 1983 cause of action in *Sea Clammers*, 453 U.S. at 20, and the review scheme provided by the Education of the Handicapped Act as the justification for its similar decision in *Smith v. Robinson*, 468 U.S. 992, 1013 (1984)).  Plaintiffs' right to resort to § 1983 will depend, therefore, on demonstrating the violation of a right.

In *Golden State*, 493 U.S. at 106, the Supreme Court outlined three factors to be considered for determining whether a federal right has been violated in § 1983 "laws" cases.  These factors subsequently stiffened into requirements, becoming the *Blessing* test:

> First, Congress must have intended that the provision in question benefit the plaintiff.
> Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence.
> Third, the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing*, 520 U.S. at 340-341 (citations omitted) (paragraphing added).

The Court cast the *Golden State* factors in imperative terms and added the requirement that an obligation must be "unambiguously" imposed. *Id.* However, it also emphasized that the statute had to accord the plaintiff a specific right to the relief sought. In *Blessing*, five Arizona mothers sought a declaratory judgment pursuant to § 1983 that the state was failing to meet its obligations under Title IV-D of the Social Security Act to obtain child support on their behalf. *Id.* at 329. The appeals court had held "in sweeping terms" that Title IV-D created enforceable rights, but the Supreme Court declared this blanket approach to be inappropriate. *Id.* at 342. Title IV-D contains numerous statutory provisions, and it "was incumbent upon respondents to identify with particularity the rights they claim." *Id.*

The Supreme Court also rejected the potential claim that an enforceable right could be found in a Title IV provision requiring Arizona to operate its child support program in substantial compliance with the title. *Id.* at 344. "Far from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV-D program." *Id.* at 343 (emphasis in original). *Blessing* instructs the court to look at the primary purpose of a statute to determine congressional intent. Although enforcement of a statute may benefit a private party, this does not mean that the statute confers an individual right. *See id.* at 344-45.

Courts continue to refer to the *Blessing* factors as requirements for finding that a statutory provision bestows a specific enforceable right. *See, e.g., Westside Mothers v. Olzsewski*, 454 F.3d 532, 541 (6th Cir. 2006) (referring to

"three requirements for establishing" enforceable rights); *Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 535 (3d Cir. 2001) (stating the court must determine if the three conditions are satisfied).  However, the Supreme Court has since made clear that the *Blessing* analysis was only a means to determine if Congress had "unambiguously conferred" a federal right.  *Gonzaga*, 536 U.S. at 283.  The *Blessing* test is not a checklist that, if its elements are satisfied individually, allows a court to infer a right.  Rather, a court must determine "whether Congress intended to create a federal right."  *Id.*

To that end, the Supreme Court instructed courts that they may look to the law governing implied private right of actions for help in deciding if a statute confers rights on a particular class of parties.[10]  *Id.* at 283-85.  A plaintiff in a § 1983 action need not show Congress' intent to create a private remedy because Congress already did this with the passage of § 1983.  However, in other respects, the analysis is similar.  *Id.* at 285.  To this end, *Gonzaga* suggests a court may decide that the law does not create any rights because the statute "by its terms grants no private rights to any identifiable class."  *Id.* at 284 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576 (1979)).  In contrast, a statute may create private rights if its text is phrased "with an *unmistakable focus* on the benefited class."  *Id.* (emphasis in *Gonzaga*) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691 (1979)).

---

[10]  These cases typically involve allegations of a private right of action against a federal actor, as opposed to a person acting under color of state law, for which § 1983 provides an express right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or federal law.

To determine whether the plaintiff in *Gonzaga*, a student suing a private university for damages, was entitled to enforce a federal prohibition against the unauthorized release of educational records, the Court closely examined the text of the statute for "rights-creating" language. *Id.* at 287.  It also scrutinized the structure of the statute, for signs of congressional intent.  *Id.*  The Court noted that Congress had required the Secretary of Education to establish a review board for investigating and adjudicating violations.  *Id.* at 289.  This action's significance lay in shedding light on Congress' intent and, in any event, was secondary to the text and wording of the statute.  *Id.* at 289-90.  The Court concluded that the statute's provisions had an aggregate, rather than individual focus, and their primary purpose was to direct the distribution of public funds.  *Id.* "[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms. . . ."  *Id.*

With the *Blessing* analysis and *Gonzaga* instructions in mind, the court examines Plaintiffs' § 1983 claims.

### 1. Violations of 42 U.S.C. § 1396a(a)(23), "Freedom of Choice,"  and § 1396a(a)(30), "Methods and Procedures"

The Plaintiffs allege that the State, in choosing managed care companies through a flawed or biased review process, has violated 42 U.S.C. § 1396a(a)(23), commonly known as Medicaid's "freedom of choice" provision. (*See* Molina Sec. Am. Compl. Counts I-II; CareSource Am. Compl. Count III.) They assert that this provision protects the rights of beneficiaries to seek treatment from any qualified provider.  (Molina Sec. Am. Compl. ¶ 72.)  The Molina Plaintiffs also state that (a)(23) protects the rights of any qualified provider

to supply that treatment (*id.*), while CareSource maintains that (a)(23) also

protects its rights to contract with any qualified provider for the benefit of its

members (CareSource Am. Compl. ¶ 73).

> The statute mandates that a State plan for medical assistance must:
>
> > provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services, and (B) an enrollment of an individual eligible for medical assistance in a primary care case-management system (described in section 1396n(b)(1) of this title), a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title. . . .

42 U.S.C. § 1396a(a)(23).

As one circuit has remarked, deciphering Congress' intent from the text of

such statutes is "assuredly not for the timid."  *Sabree by Sabree v. Richman*, 367

F.3d 180, 183 (3d Cir. 2004).

In *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006), the Sixth Circuit

parsed this statute.  The court determined, on the basis of the statute's

mandatory, individually focused wording ("*must* provide that *any individual …*

*may obtain*") and its conclusion that the statute was not vague, that the statute

secured Medicaid beneficiaries a right that could be vindicated under § 1983.  *Id.*

at 461-62; *but compare M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah

2003) (declaring that the statutory provision does not contain "unambiguous

rights-creating language" required by *Gonzaga*).  Even if this court were to find

the Sixth Circuit's reasoning persuasive, it would still have to decide if (a)(23)

22

also conferred rights on the providers, the managed care organizations, and their employees.

Such an analysis, however, is not required.  As Plaintiffs concede, both in their complaints and at oral argument, the Medicaid Act authorizes the Secretary for Health and Human Services to waive most requirements of § 1396a, including (a)(23).  42 U.S.C. § 1396n(4)(b).

This waiver also extends to §1396a(a)(30), which the Plaintiffs also allege that the State violated.  (*See* Molina Sec. Am. Compl. Counts IV; CareSource Am. Compl. Count IV.)  This statutory provision, sometimes referred to as Medicaid's "methods and procedures" rule, sets forth general objectives for a state's payment procedures.  *See, e.g.*, *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 56 (1st Cir. 2004).  In lay terms, a state should strive to be lean but not so stingy that access to care suffers.

The relevant text of this provision is considerably more susceptible to a *Blessing-Gonzaga* analysis.  A state plan must:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

42 U.S.C. § 1396a(a)(30)(A).

As the First Circuit has noted, this provision contains none of the rights-creating language that *Gonzaga* requires.  *Long Term Care*, 362 F.3d at 57.  Nor

does it focus on any individual class of beneficiaries, the other "touchstone" of the *Gonzaga* analysis. *Id.* In the four years since the Supreme Court's decision, the Sixth, Ninth, and Tenth Circuits have reached the same conclusion: (a)(30) contains no language showing Congress's unambiguous intent to confer a right. *Westside Mothers v. Olszewksi*, 454 F.3d 532, 542 (6th Cir. 2006) (concluding the provision has an "aggregate focus" rather than an individual one); *Sanchez v. Johnson*, 416 F.3d 1051, 1059 (9th Cir. 2005) (declaring that nothing in the text "unmistakably focuses on recipients or providers as individuals"); *Mandy R. ex rel. Mr. & Mrs. R. v. Owens*, 464 F.3d 1139, 1148 (10th Cir. 2006) (stating that (a)(30) "never establishes an 'identifiable class' of rights-holders").

Of the federal appellate courts, only the Eighth Circuit has found, post-*Gonzaga*, that the provision confers a right. *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 443 F.3d 1005, 1014 (8th Cir. 2006). However, the court did not examine the statute's text for rights-creating language or phrasing showing an "unmistakable focus" on a benefited class. Rather it concluded that (a)(30) met *Gonzaga*'s requirements because beneficiaries were recipients of Medicaid payments and the "scope" of the statute was clear. *Id.* at 1015. The decision appears based on a "zone of interest" analysis that the Supreme Court emphatically disavowed. *See Gonzaga*, 536 U.S. at 283. At any rate, the court did not engage in the methodical textual inquiry that *Gonzaga* now requires.

The Plaintiffs' (a)(30) claims could be easily dismissed, regardless of whether a waiver was in effect, were it not for a Seventh Circuit case holding that providers have a private right of action to enforce (a)(30). *Methodist Hosps., Inc.*

24

*v. Sullivan*, 91 F.3d 1026, 1029 (7th Cir. 1996).  Although the Seventh Circuit reached this conclusion prior to *Blessing* and *Gonzaga*, the decision is, as Plaintiffs stated in oral argument, still good law in this circuit.  But this does not do the Plaintiffs much good.

The Seventh Circuit concluded that (a)(30) bestowed a right upon providers, but a very limited one.  The court found only a right of providers to enforce the state's obligation to adopt a payment plan that would ensure sufficiently adequate access to care.  *Id.*  In this sense, *Methodist Hospitals* anticipated the Supreme Court's concern in *Blessing* that courts should not use a blanket approach to rights analysis but instead determine with particularity the specific rights afforded.  The Seventh Circuit found that while a provider might have a basis for complaining about the result of the state's action – inadequate reimbursements to achieve (a)(30)'s goals – it could not dictate the methods employed.  *Id.* at 1030.  "[S]tates may behave like other buyers of goods and services in the marketplace: they may say what they are willing to pay and see whether this brings forth an adequate supply.  If not, the state may (and under § 1396a(a)(30), must) raise the price until the market clears."  *Id.*

Plaintiffs here are asking the court to oversee the State's methodology.  They allege, but cannot show, that the State awards will not achieve sufficient access for providers.  Although they point to geographical "holes" in one of the three new provider networks, this does not mean that recipients in those areas will lack access to a provider through one of the other networks or that the alleged deficiencies will not be corrected by the time that the contracts take

effect.  Their complaint is solely with the methods that the State employed.  This is not an (a)(30) concern.[11]

### 2.  Violations of 42 U.S.C. § 1396n(b)(4) – Waiver Requirements

Section 1915(b) of the Medicaid Act, codified at 42 U.S.C. § 1396n, allows a state to provide Medicaid health care through a managed care program, either in whole or in part.  *Solter v. Health Partners of Phila., Inc.,* 215 F. Supp. 2d 533, 535 (E.D. Pa. 2002).  To accomplish this, Congress has authorized the Secretary for Health and Human Services, "to the extent that he finds it to be cost-effective and not inconsistent with the purposes of this subchapter," to waive requirements of § 1396a, such as the freedom of choice and methods and procedures provisions.  42 U.S.C. § 1396n(b).  "Waivers are intended to provide the flexibility needed to enable States to try new or different approaches to the efficient and cost-effective delivery of health care services, or to adapt their programs to the special needs of particular areas or groups of recipients."  42 C.F.R. § 430.25(b); *see also Okla. Chapter of Am. Acad. of Pediatrics*, 366 F. Supp. 2d 1050, 1102-03 (N.D. Okla. 2005).

---

[11]  The Seventh Circuit has provided at least some indication that its *Methodist Hospitals* finding of an enforceable right might not stand in the wake of *Blessing* and *Gonzaga*.  *See Bruggeman ex. rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 911 (7th Cir. 2003) (finding that a Medicaid provision requiring services to be provided in a manner consistent with a recipient's best interests to be vague and lack any ability to sustain a rights-creating interpretation, "given the Supreme Court's hostility, most recently and emphatically expressed in *Gonzaga University v. Doe* [citation omitted] to implying such rights in spending statutes").  For this reason and the reasons noted in the text above, the court does not find persuasive two Seventh Circuit district court decisions concluding that (a)(30) confers rights.  *See Nelson v. Milwaukee County Dep't of Health & Human Servs.*, No. 04 C 0193, 2006 WL 290510, at *9 (E.D. Wis. Feb. 7, 2006); *Memisovski ex rel. Memisovski v. Maram*, No. 92 C 1982, 2004 WL 1878332, at *7 (N.D. Ill. Aug. 23, 2004).

The parties agree that Indiana has obtained such a waiver, and, in fact, the Plaintiffs received their existing contracts with the State only as a result of such a waiver.  (*See* Molina Sec. Am. Compl. ¶¶ 20-22; CareSource Am. Compl. ¶¶ 14-16).  Moreover, the Plaintiffs assert, and the court will accept as true for the purposes of this matter, that the State made certain commitments in the plan approved by the Secretary.  These commitments include the assurance that the State would procure MCOs "through an open, competitive procurement process" consistent with federal regulations.  (Molina Sec. Am. Compl. ¶ 23; *see also* CareSource Am. Compl. ¶ 17.)  It represented also that it would comply with Indiana's procurement policies and procedures.  (Molina Sec. Am. Compl. ¶ 72; CareSource Am. Compl. ¶ 74.)

Plaintiffs now seek to enforce the waiver under two legal theories.  First, they assert rights under (a)(23) and (a)(30) on the theory, unsupported by any case law, that a failure to adhere to the terms of a waiver automatically becomes a violation of those Medicaid provisions that were waived.  (*See, e.g.*, CareSource Am. Compl. ¶ 15 (stating "Indiana must adhere to those terms to comply with Indiana's waiver and to avoid violating the requirements of 42 U.S.C. § 1396(a)"); Molina Sec. Am. Compl. ¶ 73 (declaring that the State had violated the terms of its waiver "and lost the authorization to restrict the statutory rights of providers and beneficiaries under 42 U.S.C. § 1396a(a)(23)").)

To support this theory, the Plaintiffs have expended substantial effort pointing out the various ways in which the State failed to abide by a requirement or term of its state plan.  The State ignored certain requirements and procedures

27

set forth in its Request for services and relied on other unstated requirements. (Molina Sec. Am. Compl. ¶¶ 42-48; CareSource Am. Compl. ¶¶ 28-34.)  The state awarded a contract to an ineligible bidder.  (Molina Sec. Am. Compl. ¶¶ 49-51; CareSource Am. Compl. ¶ 37.)  The state miscalculated scores.  (Molina Sec. Am. Compl. ¶¶  55-59; CareSource Am. Compl. ¶ 35.)  The State allowed all bidders but CareSource to revise the economic impact sections of their proposals.  (CareSource Am. Compl. ¶ 36.)  The State violated the rule that only a single state agency administer the plan.  (CareSource  Am. Compl. ¶¶ 45-60.) In their pleadings, exhibits, and oral arguments, Molina and CareSource cited additional deficiencies.  Yet, under the Plaintiffs' legal theory, all these violations and shortcomings serve but one purpose.  They establish that the State violated its federal commitments, thus triggering violations of Plaintiffs' rights under the waived statutory provisions.

While innovative, such a theory seems implausible at best.  A citizen who receives a driving license on the implied promise to abide by a state's motor vehicle laws is not guilty of driving without a license when caught speeding. Here, the Plaintiffs allege that the State, because it violated terms of its waiver, is therefore guilty of violating the freedom of choice and methods and procedure provisions.  This is nothing more than a backhanded effort to secure the Plaintiffs a right to enforce each and every provision of the State plan.[12]  Such a position

---

[12]  If the State's violation of any portion of its state plan means that the State has breached its waiver and thus also the waived provisions, then any party afforded a right under a waived (a)(23) provision could immediately bring a lawsuit merely by alleging the State had failed to abide by some aspect of its plan, whether related to the party's rights or not.

would render the waiver meaningless.  No state would embark on such a perilous path.  The court cannot accept this position.  If there is any redress for the injuries that Plaintiffs assert in their (a)(23) and (a)(30) claims, the cause of action will have to be found not in the rights secured by those waived statutes, but in the rights, if any, conferred by Congress in the waiver statute itself.

The court finds support for its position in a Second Circuit decision involving a nursing home's challenge to New York's attempt to recover funds after a state audit uncovered overpayments to the facility.  *See Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono*, 179 F.3d 38, 40 (2d Cir. 1999).  The nursing home challenged the audit on the grounds that the auditors violated state procedural requirements and that New York had therefore changed its Medicaid plan without federal approval.  The court responded:

> The fact that federal law conditions State participation in the Medicaid program on the State's adoption of a Medicaid plan does not thereby transform provisions of a State's plan into federal law.  The reason is plain.  Were it otherwise, federal jurisdiction could be invoked to review each claimed error in a State's administration of its Medicaid plan, which would needlessly undermine State sovereignty, contrary to settled precedent.

*Id.* at 44.[13]

Perhaps realizing the tenuous basis of this derivative cause of action, the Molina Plaintiffs seek redress under a second theory, that the State directly violated rights secured to them by 42 U.S.C. § 1396n(b)(4), the principal waiver

---

[13]  The Second Circuit dismissed the nursing home's complaint on jurisdictional grounds, which this court declines to do, instead following the Seventh Circuit's binding instruction in *Bruggeman ex. rel. Bruggeman  v. Blagojevich*, 324 F.3d 906, 909 (7th Cir. 2003).

statute.  (Molina Sec. Am. Compl. Count III.)  Although CareSource did not bring

such a claim  directly, its pleadings can be construed as asserting a violation of

its rights under n(b)(4) as well.  (*See* CareSource Am. Compl. ¶ 14; CareSource

Resp. Br. 27.)  The court must therefore examine the waiver provision to

determine if Congress unambiguously conveyed rights upon any of the plaintiffs

in this section of the Medicaid Act.

>   The statute reads:

>   The Secretary, to the extent he finds it to be cost-effective and efficient
>   and not inconsistent with the purposes of this subchapter, may waive such
>   requirements of section 1396a of this title . . . as may be necessary for a
>   State . . .  (4) to restrict the provider from (or through) whom an individual
>   (eligible for medical assistance under this subchapter) can obtain services
>   (other than in emergency circumstances) to providers or practitioners who
>   undertake to provide such services and who meet, accept, and comply
>   with the reimbursement, quality, and utilization standards under the State
>   plan, which standards shall be consistent with the requirements of section
>   1396r-4 of this title and are consistent with access, quality, and efficient
>   and economic provision of covered care and services, if such restriction
>   does not discriminate among classes of providers on grounds unrelated to
>   their demonstrated effectiveness and efficiency in providing those services
>   and if providers under such restriction are paid on a timely basis in the
>   same manner as health care practitioners must be paid under section
>   1396a(a)(37)(A) of this title.

42 U.S.C. § 1396n(b)

As one court remarked, "[t]he convoluted grammar of this section defeats

authoritative interpretation."  *See Clayworth v. Bonta*, 295 F. Supp. 2d 1110,

1125 (E.D. Cal. 2003).  However, several points are clear enough.  First, the

statute instructs the Secretary that the general purpose of the waiver is to

promote cost savings and efficiency.  Secondly, it authorizes the Secretary to

grant waivers so long as three conditions are met.  One, providers comply with

the state plan standards for reimbursement, quality, and "utilization" of services. Two, the state only discriminates against "classes of providers" on the basis of their effectiveness and efficiency.  Three, the MCOs pay providers in the same timely manner as the state was obligated to pay under its fee-for-service plan.

Plaintiffs have focused on the first and second conditions.  Seizing on a phrase used in the statute to qualify the standard for providers, Molina alleges that the State imposed conditions "not consistent with access, quality, and efficient and economic provision of the covered care and services."  (*See* Molina Sec. Am. Compl. ¶ 91.)  It also contends, however, that the State discriminated against Molina's network – its class of providers – on grounds unrelated to effectiveness and efficiency.

It is this second charge that should cause the Defendants some alarm. The statute does not define "class of providers," and if the MCOs are viewed as classes of providers, the State does not dispute that it considered factors other than effectiveness and efficiency in evaluating the bidders' proposals.  Bidders were ranked not just on the basis of business and technical requirements, but also on their potential impact upon the Indiana economy and the level of included participation by woman and minorities.  (*See, e.g.*, Molina Sec. Am. Compl. ¶ 54.) Whether the State actually discriminated on these grounds could be debated because, as the State argued at the preliminary injunction hearing, the three bidders who received the top scores overall also received the top business and technical scores.  (Letter from Jessica Robertson to Jeanne LaBrecque (Aug. 3,

2006) in Molina Reply Br. Supp. Mot. Prelim. Inj. Ex. 13).  This would be a factual issue for further consideration if § 1396n(b)(4) bestows rights upon the Plaintiffs.

It does not.  The aim of this statute is to provide the Secretary guidance on the issuance of waivers and the grounds for the revocation of waivers.  Unlike § 1396a(a)(23), in which the Sixth Circuit found "rights-creating" language and which began, "A state plan for medical assistance must," n(b)(4) is only an authorization.  It states only the circumstances under which the Secretary "may" act.  Providers are mentioned but not in imperative terms.

In *Gonzaga*, 536 U.S. at 284, the Supreme Court found that Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 created individual rights because of their unmistakable focus on the benefited class.  The prohibitions against discrimination found in these acts were not conditions of funding, as in the educational statute at issue in *Gonzaga*, or a condition for waiver, as here.  Rather, the Supreme Court noted that Congress spoke in a command: "No person … shall .. be subjected to discrimination."  *Id.* at 287.  Here, the statute backs into the subject.  "The Secretary … may waive … if such restriction does not discriminate . . . ."  42 U.S.C. § 1396n(b)(4).  The providers may indeed benefit from this language, but the focus is not on them, but on the Secretary.  The statute does not "unambiguously confer" rights upon the Plaintiffs.

The court will therefore **GRANT** the Defendants' motion to dismiss Counts I, II, III, and IV of Molina's Second Amended Complaint and Counts III and IV of CareSource's Amended Complaint.

Of course, the court has in mind the liberal notice pleading concept and the generous favorable inferences that are to be made in favor of the Plaintiffs in reaching this decision.  In looking through the lens of Rule 12(b)(6), the court can order dismissal only if it has been demonstrated that under no set of provable facts would the law allow the Plaintiffs to prevail.  Most often, a court is required or allowed to hypothecate what a plaintiff might prove in the universe of potential facts.

But this case is in a slightly different posture, which eliminates the need to guess what the plaintiff might be attempting to prove.  The parties have participated in a vigorous, expedited discovery regimen and submitted voluminous documents, stipulations, and testimony in connection with the preliminary injunction requests.  The Plaintiffs have made the nature of the evidence they could prove crystal clear.  Of course it is conceivable that additional documents and testimony could be added to the small mountain already before the court – but it would all circle back to the same place, the disputed evaluation process.  The parameters of that process have been adequately identified to the court to show that the Plaintiffs' theories have no legal foundation under the auspices of § 1983.

For the reasons discussed above, these counts are dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted under federal law.[14]

---

[14]  This explanation of the court's basis for dismissal under Rule 12(b)(6) applies (continued . . .)

### C. Violation of Federal Procurement Statutes, Regulations, Norms

CareSource's assertion that the State violated a federal right secured by the federal procurement statutes, regulations, and norms stands on even shakier grounds.  Section 1983 by its terms only provides a remedy for the deprivation of rights secured by the Constitution or laws, not regulations or norms.  The latter are the creation of executive agencies whereas the boundaries of § 1983 are defined by Congress.  As this Court noted in *Indianapolis Minority Contractors Association v. Wiley*, No. IP 94-1175-C, 1998 WL 1988826, at *24 (S.D. Ind. May 13, 1998), the relevant question in a § 1983 inquiry is whether Congress "unambiguously conferred" a right.

As with CareSource's bootstrapped (a)(23) and (a)(30) claims, CareSource apparently locates a federal right to require a state to comply with federal procurement statutes in the State's commitment to contract for managed care through a competitive process "consistent" with 45 C.F.R. Part 74.[15] (Caresource Am. Compl. ¶¶ 17-18.)  However, an agency's stamp of approval cannot create federal rights from the promises that a state makes in its plan.  Nor does the waiver provision provide any rights enforcing federal procurement rules.

The Court will **GRANT** Defendant's motion to dismiss Counts V and VI of CareSource's Amended Complaint.

---

to the court's consideration and disposal of the remaining substantive counts, also.

[15]  CareSource also appears to argue that it has a direct federal cause of action to require a state agency receiving federal funds to abide by federal procurement regulations.  However, it does not cite its statutory source for such an action or any case law supporting this argument.

### D. Plaintiffs' Alleged Due Process Violations

#### 1. Procedural due process

It is elementary that the Fourteenth Amendment protects individuals from state deprivations of life, liberty, and property without some measure of due process.  It is also well understood that liberty and property in this constitutional setting mean more than just freedom from restraint or realty and goods.  It also includes such intangibles as welfare benefits, *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), a person's legal status, *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1970), and statutory rights to attend school, *Goss v. Lopez*, 419 U.S. 565, 573 (1975).

Not all interests are protected, however.  Generally these are interests that develop from rules or understandings arising from a law or other independent source.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Id.*

This then is the nub.  What "legitimate claim of entitlement" did the State violate in its selection process or by its decision?  This is, as CareSource recognizes, the first of the two-step process for analyzing a procedural due process claim.  *Sonnleitner v. York*, 304 F.3d 704, 711 (7th Cir. 2002).  If an answer to the first question is found, then the second step is determining what process is due the injured party.  *Id.*  However, it is at the first step, finding a deprivation of a protected interest, that CareSource's claim stalls.

In Count I of its Amended Complaint, CareSource asserts its entitlement arises from the rights conferred by the Medicaid Act.  (Caresource Am. Comp. ¶ 64.)  While not pointing to any particular right, it complains about the State's failures to follow the rules in evaluating the proposals.  (*Id.* ¶ 65.)  However, as discussed above, the State's commitments to the federal government regarding the provisions of its plan do not create enforceable federal rights for the Plaintiffs.

Nor does Indiana law accord bidders an entitlement to persons or companies seeking state contracts.  As the State points out, the Indiana General Assembly has expressly declined to recognize that parties seeking state work have any property interest involved prior to the formation of a contract.  Ind. Code § 5-22-3-6.  "An offeror does not gain a property interest in the award of a contract by a governmental body unless: (1) the offeror is awarded the contract; and (2) the contract is completed executed."  *Id.*; *see also Kim Constr. Co. v. Bd. of Trustees*, 14 F.3d 1243, 1247 (7th Cir. 1994) (declaring, in the context of a municipal bid, that "[i]n the absence of an underlying property interest, the Due Process Clause does not require states to obey their own procedural rules").

In its response brief, CareSource shifts gears.  It contends that its protected property interest is a "right to contract."  (CareSource Resp. 22.)  However, CareSource conflates the right to make contacts with a right to require contract negotiations.  *Roth*, the Supreme Court case cited by CareSource, does not stand for the latter.  Rather, the Court held just the opposite, declaring that a contract professor at a public university had no property interest that would

require university officials to grant him a hearing before declining to renew his contract.  *Roth*, 408 U.S. at 575.

The circumstances in *Roth* are instructive.  Hired for a term of one year, the professor alleged that the state was running rough shod over his career, allegedly in retaliation for remarks he had made, when it failed to grant him a hearing prior to its decision not to renew his contract.  *Id.* at 566-68.  The Court declared, "the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year . . . .  Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it."  *Id.* at 578.

The Court also declined to find any deprivation of Roth's liberty interest in his right to engage in privileges enjoyed by free people, including the right to contract with others.  *Id.* at 572.  The university had not engaged in any conduct assailing the professor's reputation or integrity, or attempted to bar his hiring by others.  *Id.* at 573.  "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another."  *Id.* at 575.

CareSource's other authority for its "right to contract," *Continental Training Services, Inc. v. Cavazo*s, 893 F.2d 877 (7th Cir. 1990), is not persuasive.  In *Continental*, the federal Department of Education attempted to revoke a vocational school's certification for participation in federal student aid programs before affording the school a hearing as required by federal law.  *Id.* at 880-81.  The district court enjoined the Department from revoking the school's certification

until the school, Continental Training, was granted a full hearing.  *Id.* at 894.  The appellate court affirmed this order.  *Id.*

CareSource cites this case as further support for its claim of a protected property interest.  (CareSource Resp. 22.)  However, the two cases are not analogous.  CareSource has a contract with the State that will expire at the end of this year.  That is the source of its property interest, and CareSource has not alleged that the State has attempted to revoke or impair that interest.  In Continental Training, the school's property interest arose from the rights specifically accorded by statute.   *Cavazos*, 893 F.2d at 893.  The Seventh Circuit did not declare that Continental Training had a right to contract with the state.  Rather, it simply declared that where procedural rights were bestowed by statute, the government was required to provide them.  *Id.* at 892.

Finally, it is worth noting that the Seventh Circuit did not find that the Department of Education violated Continental Training's rights to procedural due process.  *Id.* at 894.  Despite the quashed attempt at avoiding a full hearing, the Department had provided Continental Training with sufficient notice of its intentions to revoke the school's certification.  *Id.*

The court is at loss to determine how CareSource has been deprived of a property or liberty right.  The state accepted CareSource's bid and evaluated it; the state accepted CareSource's protest and responded.  (CareSource Resp. 22.)  Although CareSource complains that the review was not meaningful because of unreasonable delays and the State's failure to provide records, it cites no statutory requirements for the procedure the State should have followed.

The court will not undertake the due process analysis set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), when CareSource has not established a deprivation of a protected right.  However, the court is mindful of some of the factors that would be involved – the benefit to the state and contractors of fair procedures, the difficulties of government contracting, and the incentives present in every contract award to argue over selection procedures that invariably require the exercise of human judgment.

### 2.  Substantive due process

Substantive due process is a doctrine arising from the structure of the Constitution.  *Nat'l Paint & Coatings Assoc. v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir. 1995).  The "touchstone," as the Supreme Court has frequently stated, is a protection of individuals "from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice."  *Bank of Columbia v. Okely*, 17 U.S. 235, 244 (1819), *quoted in County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).  This protection has two forms.  *United States v. Salerno*, 481 U.S. 739, 746 (1987).  It restrains the state from interfering with "rights implicit in the concept of ordered liberty."  *Id.* (citing *Palko v. Connecticut*, 302 U.S. 319, 325-326 (1937).  Secondly, with regard to executive action, it protects individuals against state action that "shocks the conscience."  *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)).

CareSource asserts that the State's evaluation process was so flawed as to constitute an "arbitrary abuse of power by the government."  (*See* CareSource Am. Compl. ¶ 68 (Count I).)  It acknowledges the Supreme Court's "shock the

conscience" standard.  (CareSource Resp. 18.)  Essentially, however, it argues that any governmental action that violates "fundamental notions of fairness" will support a due process claim.  (*Id.* (citing *White v. Rochford*, 592 F.2d 381, 385 (Ill. 1979).)[16]

The reach of substantive due process protection is not so broad.  The first prong is circumscribed to the protection of deeply rooted fundamental rights and liberties.  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).  The second prong, involving acts that "shock the conscience," requires conduct that is egregious and outrageous.  *Lewis*, 523 U.S. at 847.  The Supreme Court has hesitated at finding constitutional violations for merely offensive or callous conduct.  *See, e.g.*, *Chavez v. Martinez*, 538 U.S. 760, 774-75 (2003) (holding that an officer's persistent emergency room questioning of a police shooting victim did not shock the conscience even though he was in pain and feared that he was dying); *Lewis*, 523 U.S. at 840 (finding no substantive due process violation in an officer's deliberate indifference during a high-speed chase that led to the death of a teen motorcyclist).

As the Seventh Circuit has noted, substantive due process claims are not available merely because governmental conduct appears "arbitrary" or "capricious" as these words are used when a court reviews an agency action or a

---

[16]  Although CareSource correctly quotes from this case, the Seventh Circuit's decision could not be said to stand for a holding that mere unfairness can be the basis for a substantive due process claim.  In *Rochford*, 592 F.2d at 382, police officers had abandoned three minor children by leaving them in a car at night on the Chicago Skyway, a busy limited access highway, after arresting the driver.  The court concluded that the officers action could be viewed as an unjustified intrusion on the children's personal integrity or as conduct that shocked the conscience.  *Id.* at 384.

lower court's decision for an abuse of discretion.  *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 966 (7th Cir. 1998).  Rather, a plaintiff must show "an extraordinary departure from established norms" to support a substantive due process claim.  *Id.*

CareSource has not shown or alleged conduct that rises to the "conscience shocking" standard that the Supreme Court requires for substantive due process' second prong.  The alleged shortcomings in the evaluation process – ignoring some standards, failing to treat bidders equally, violating commitments it made to the federal government in its state plan – may be cause for concern, frustration, and perhaps, on the part of losing bidders, anger.  However, such treatment is not so outrageous as to shock contemporary conscience.

The Seventh Circuit generally follows the Supreme Court's approach in *Glucksberg* when analyzing substantive due process claims.  *See Galdikas v. Fagan*, 342 F.3d 684, 688 (7th Cir. 2003).  The first step requires carefully identifying the interest that plaintiffs claim to be constitutionally protected.  *Id.* Then the court must determine whether this interest can be characterized as fundamental and rooted in legal tradition or historical practices.  *Id.*

The claim asserted by CareSource is best described as the right of a bidder for government work to fair procedures in the bidding process.  This is not a new claim.  The theory for such a § 1983 action apparently began with *Three Rivers Cablevision v. City of Pittsburgh*, 502 F. Supp. 1118, 1131 (W.D. Pa. 1980).  *See Circa Ltd. v. City of Miami*, 79 F.3d 1057, 1063 (11th Cir. 1996)

(describing the origins of this theory).  Courts that have adopted *Three Rivers* tend to allow losing bidders to maintain claims when (1) the bidding process was regulated, (2) the losing bidder materially complied with the procedures, and (3) the losing bidder could show significant and material noncompliance by the winning bidder.  *Circa*, 79 F.3d at 1063.

The Seventh Circuit discussed the *Three Rivers* cause of action in *Kim Construction Co. v. Board of Trustees*, 14 F.3d 1243, 1248 (7th Cir. 1994).  However, the court noted, in discussing a particular case cited by the plaintiff, that the law of that state created a property interest in favor of the lowest responsible bidder and prohibited the government's exercise of any discretion to reject that bidder.  Noting that Illinois law did not create such a property interest or requirements, the court dismissed the plaintiff's substantive due process claim. *Id.* at 1248-49.  For similar reasons, the same result governs here.  Indiana law specifically disclaims the creation of a property interest on the part of any bidder, including the winner, until a contract has been executed.  Ind. Code § 5-22-3-6.

Nor, as may be surmised from the foregoing discussion, can the right asserted by CareSource be described as fundamental and rooted in legal tradition or historical practices.  As such, CareSource only has an interest of acquiring property, and the Seventh Circuit has held more than once that a deprivation of potential rights or liberties will not support a substantive due process claim.  *See, e.g., Kyle v. Morton High Sch.*, 144 F.3d 448, 452 (7th Cir.

1998) (stating that "the loss of the opportunity to acquire property is not a deprivation of a constitutional right").

Lastly, even if discovery were to continue and CareSource was able to establish conduct by the State that did shock the conscience of contemporary society – although the court cannot conceive what sort of conduct that might be in a contractual setting, short of outright bribery – CareSource's substantive due process claim would fail. To prevail on a substantive due process claim, a plaintiff must still establish a deprivation of an underlying property or liberty interest. *Wroblewski v. City of Washburn*, 965 F.2d 452, 457 (7th Cir. 1992). By law, CareSource has none. Although the State's decision will affect CareSource dramatically, it does not have a liberty or property interest in the bid selection process – only the interests of any concerned taxpayer.

For the foregoing reasons, the court will **GRANT** Defendants' motions to dismiss CareSource's due process claims, Counts I and II of its Amended Complaint.

### E. CareSource's Bad Faith Claim

CareSource alleges that the State has breached a duty to treat all bidders honestly and fairly. (CareSource Am. Compl. Count VII.) It has not identified whether it is asserting an additional § 1983 cause of action or the court's supplemental jurisdiction to hear matters of state law, but the claim fails either way. As noted several times, CareSource must establish the violation of a federal right, either under the Constitution or in a statute clearly conveying

43

Congress' intent to establish a right, for a § 1983 claim.  Medicaid, however, is a spending statute.  State law governs the state's duties toward bidders.  No federal rights are involved.

As an issue of state law, CareSource's claim must fail, also.  Indiana imposes a duty of good faith and fair dealing only in a few limited situations.  One is insurance contracts.  *See Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 517 (Ind. 1993) (affirming an insurer's duty to deal in good faith with its insured and recognizing a cause of action in tort for a breach of this duty).  In most other circumstances, Indiana courts impose a duty of good faith and fair dealing only if the parties are in a confidential, fiduciary, or similar relationship.  *See Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162-63 (Ind. 2002) (holding that a principal has an obligation to avoid placing an agent in harm's way); *First Fed. Sav. Bank v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990) (declaring that Indiana does not engraft a good faith requirement on contracts generally); *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 451 (Ind. Ct. App. 2003) (concluding that breaches of good faith and fair dealing are breaches of fiduciary duty).

The court is aware of no law establishing fiduciary duties on the part of a government when seeking bids or proposals for the supply of goods or services.  Just the opposite, the state procurement laws are generally aimed at ensuring arms-length transactions.  Nor does the State have any fiduciary duties toward an existing contract holder.  *See Morgan Asset Holding Corp. v. CoBank, ACB*,

736 N.E.2d 1268, 1273 (Ind. Ct. App. 2000) (declaring that a contractual relationship will not give rise to a fiduciary duty; the duty must arise by operation of law).

The Court will **GRANT** Defendants' motions to dismiss Count VII of CareSource's Amended Complaint.

### F.  Plaintiffs' Requests for Declaratory Relief

Both CareSource and the Molina Plaintiffs have also requested declaratory relief.  The federal Declaratory Judgment Act allows a federal court, in a case or controversy within its jurisdiction, to declare the rights and legal relations of parties "whether or not further relief is or could be sought."  28 U.S.C. § 2201; *Calderon v. Ashmus*, 523 U.S. 740, 745-46 (1998).  However, a party seeking declaratory relief must still establish jurisdiction on the basis of the underlying substantive claim.  Here, where the court will dismiss the underlying substantive claims, it lacks jurisdiction to consider the Plaintiffs' declaratory claims.  The Court will therefore **GRANT** Defendants' motions to dismiss Count V of Molina's Second Amended Complaint and Count VIII of CareSource's Amended Complaint.

## IV.  CONCLUSION

For these reasons, the court **GRANTS** Defendants' Motions to Dismiss the Plaintiffs' Complaints, as amended (Document Nos. 31-8, 47-2, 56, 58, and 61 in 1:06-cv-1483 and Document Nos. 26-10 and 43-2 as initially filed in 1:06-cv-1486).[17]  Judgment will be entered by separate order.

ALL OF WHICH IS ENTERED this 4th day of December 2006.

_____
John Daniel Tinder, Judge
United States District Court

Copy by U.S. mail to:

Elisabeth A. Squeglia
BRICKER & ECKLER LLP
100 South Third Street
Columbus, OH 43215

Electronic copies to:

Magistrate Judge William T. Lawrence

_____

[17]  Of course, because of this result, there is no need to consider the Plaintiffs' Amended Motions for Preliminary Injunction (Document No. 34 in 1:06-cv-1483 and Document No. 33 as initially filed in 1:06-cv-1486).  However, had they been addressed, it is evident to the court that the motions would have failed because of the Plaintiffs' inability to show a reasonable likelihood of success on the merits, for the reasons discussed in this entry.

Neil H. O'Donnell
ROGERS JOSEPH O'DONNELL &
   PHILLIPS
nodonnell@rjop.com

Thomas D. Blanford
ROGERS JOSEPH O'DONNELL &
   PHILLIPS
tdb@rjop.com

Anthony W. Overholt
LOCKE REYNOLDS LLP
aoverholt@locke.com

Carrie Gibson Doehrmann
LOCKE REYNOLDS LLP
cdoehrmann@locke.com

James Dimos
LOCKE REYNOLDS LLP
jdimos@locke.com

James W. Riley, Jr.
RILEY BENNETT & EGLOFF LLP
jriley@rbelaw.com

Kevin Nicholas Tharp
RILEY BENNETT & EGLOFF LLP
ktharp@rbelaw.com

Mark R. Chilson
BRICKER & ECKLER LLP
mchilson@bricker.com

Harry John Watson, III
INDIANA STATE ATTORNEY
   GENERAL
jack.watson@atg.in.gov

Robert B. Wente
INDIANA STATE ATTORNEY
   GENERAL
robert.wente@atg.in.gov

Libby Yin Mote
KRIEG DEVAULT
lmote@kdlegal.com

Marc T. Quigley
KRIEG DEVAULT
mquigley@kdlegal.com

Brian Edward Bailey
ICE MILLER LLP
brian.bailey@icemiller.com

Fred R. Biesecker
ICE MILLER LLP
fred.biesecker@icemiller.com

Michael A. Wukmer
ICE MILLER LLP
michael.wukmer@icemiller.com

Offer Korin
KATZ & KORIN
okorin@katzkorin.com

Ronald George Sentman
KATZ & KORIN
rsentman@katzkorin.com

Sally F. Zweig
KATZ & KORIN
szweig@katzkorin.com

N. Kent Smith
HALL RENDER KILLIAN HEATH &
   LYMAN
ksmith@hallrender.com